194

[No. 49489-9-I.   Division One.   October 14, 2002.]

RESTAURANT DEVELOPMENT, INC., *Appellant*, v. CANANWILL, INC., *Respondent*.

*Bradford A. Steiner* (of *Steiner Norris, P.L.L.C.*), for appellant.

*Nicholas P. Gellart* (of *Perkins Coie, L.L.P*), for respondent.

KENNEDY, J. — Washington's Insurance Premium Finance Company Act (IPFCA), chapter 48.56 RCW, authorizes insurance premium finance companies, such as Cananwill, Inc., the respondent in this action, to charge their customers precomputed interest at a 10 percent add-on rate, which results in a higher effective annual percentage rate (APR) than would be the case if interest were computed actuarially on the declining principal balance. If the financed

insurance contract is cancelled prematurely, the insurance company must return whatever gross unearned premiums are due under the insurance contract to the premium finance company. But contrary to the understanding of Restaurant Development, Inc. (RDI), the appellant in this action, the premium finance company takes any such refunded monies "for the account of the insured" and must in turn refund any unearned interest on the loan of one dollar or more to the insured. Accordingly, RDI's argument that the legislature must have intended to permit insurance premium finance companies to charge only simple interest of 10 percent on the declining balance of the premium financing loan, else it would have provided for the refund of unearned interest, fails. The legislature did so provide. RDI's consumer protection action also fails, in that Cananwill did nothing with respect to the insurance premium financing arrangement between these parties that is not expressly authorized by the IPFCA. Accordingly, we affirm the trial court's summary judgment dismissing RDI's complaint in its entirety.

## FACTS

On October 2, 1996, RDI, which was organized for the purpose of operating a nightclub, agreed to purchase an insurance policy from Crusader Insurance Company. RDI was presented with three premium payment choices, the first of which required a payment of $19,747 for premiums and policy fees with no financing charges and the latter two of which involved financing through Cananwill. The Installment Billing Program Acceptance Form stated the amount of service charges that RDI would incur under the second and third choices, and how those charges equated to an effective annual percentage rate.

RDI chose the third option, which had the lowest down payment, and a lower APR than the second option. Thereafter, Cananwill and RDI entered into a premium financing agreement whereby Cananwill paid Crusader Insurance

Company $19,747 for RDI's insurance premiums and policy fees for a one-year period commencing November 1, 1996, and RDI made a down payment to Cananwill of $3,356.99 and financed the remaining principle balance of $16,390.01 for a service charge of $992.35. The service charge was added to the remaining principal balance, for a total premium-financing loan of $17,382.36 to be repaid in 10 monthly installments of $1,738.24 each. The first installment payment was due on December 4, 1996, and the final installment was due on September 4, 1997. The Installment Billing Program Acceptance Form explained that the financing charge for this option equated to an APR of 13 percent. RDI paid off the loan in accord with the premium financing agreement.

In May 2000, RDI filed this lawsuit as a class action, alleging that Cananwill had violated Washington's IPFCA, and analogous statutes in other states where Cananwill conducts business, by imposing service charges to its customers in excess of the maximum amount permitted under those statutes, and further alleging that Cananwill's conduct was an unfair or deceptive act or practice in violation of Washington's Consumer Protection Act (CPA), chapter 19.86 RCW, and similar consumer protection statutes in other states where Cananwill conducts business. The parties agreed that before RDI attempted to certify the class, they would each file a motion for summary judgment on the limited issues of whether Cananwill's premium financing agreement with RDI violated Washington's IPFCA and whether the alleged violation was actionable under Washington's CPA. Accordingly, the parties filed their cross-motions on September 10, 2001. On October 12, 2001, a judge of the King County Superior Court denied RDI's motion for summary judgment and granted that of Cananwill, dismissing RDI's lawsuit in its entirety. This appeal followed.

## ANALYSIS[1]

■■■ The IPFCA governs insurance premium finance companies, which are companies "engaged in the business of entering into insurance premium finance agreements." RCW 48.56.020(1). A "premium finance agreement" is:

> an agreement by which an insured or prospective insured promises to pay to a premium finance company the amount advanced or to be advanced under the agreement to an insurer . . . in payment of premiums on an insurance contract together with a service charge as authorized and limited by this chapter and as security therefor the insurance premium finance company receives an assignment of the unearned premium.

RCW 48.56.020(2).

The IPFCA defines what an authorized service charge is under a premium finance agreement:

> (1) A premium finance company shall not charge, contract for, receive, or collect a service charge other than as permitted by this chapter.
>
> (2) The service charge is to be computed on the balance of the premiums due (after subtracting the down payment made by the insured in accordance with the premium finance agreement) from the effective date of the insurance coverage, for which the premiums are being advanced, to and including the date when the final installment of the premium finance agreement is payable.
>
> (3) The service charge shall be a maximum of *ten dollars per one hundred dollars per year* plus an acquisition charge of ten dollars per premium finance agreement which need not be refunded upon cancellation or prepayment.

RCW 48.56.090 (emphasis added).

Cananwill argues, and we agree, that this statutory language authorizes premium finance companies to charge

---

[1] We review the trial court's summary judgment order and its construction of the applicable statutes de novo. *Kruse v. Hemp*, 121 Wn.2d 715, 853 P.2d 1373 (1993) (the appellate court reviews a summary judgment order de novo); *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996) (issues of law, such as construction of a statute, are reviewed de novo).

"add-on" interest, rather than simple interest on the declining balance of the premium-financing loan.

> Add-on interest is a method for calculating "precomputed" interest in which the consumer agrees to pay the total of payments, which includes both interest and principal, as opposed to agreeing to pay the principal plus interest as it accrues at a certain rate. Because add-on interest is precomputed, the note or contract should contain an agreement as to how unearned interest will be rebated in the event of prepayment.

> With installment payments, the average unpaid balance is only slightly more than one-half of the original principal. With simple (actuarial) interest, the interest calculated when each payment is credited will decline, because the principal is declining. In contrast, add-on interest is calculated at the outset of the loan on the full amount for the full term, as if the principal did not decline over the course of the loan. . . . [A]dd-on rates always dramatically understate the effective simple or actuarial interest rate.

KATHLEEN E. KEEST & ELIZABETH RENUART, NATIONAL CONSUMER LAW CENTER, THE COST OF CREDIT: REGULATION AND LEGAL CHALLENGES, 127-28 (2d ed. 2000) (footnotes omitted).

The Minnesota Supreme Court has recognized that a finance charge expressed "in terms of a ratio of dollars per hundred dollars per year" is

> commonly known in the finance industry as an "add-on" rate, by the use of which the maximum finance charge which may be added onto the cash sale price to determine the credit price is computed on the original cash balance of an installment obligation without regard to the declining balance as monthly payments are made by the buyer.

*Ruona v. Freeway Dodge, Inc.*, 285 Minn. 23, 171 N.W.2d 212, 216 (1969) (construing Minnesota's Motor Vehicle Retail Installment Sales Act); *see also* KEEST ET AL., *supra*, at 129 ("[a]dd-on interest rate statutes [may] not use the words 'add-on' to describe the rates therein. They may, for example, use such terms as '$8.00 per $100 per annum' to describe an 8% add-on rate"). Given the wording of our own premium financing statute expressing maximum allowable

service charges in terms of a ratio of "ten dollars per hundred dollars per year," it is thus unsurprising that Publication No. 830, entitled "The Cost of Personal Borrowing in the United States," prepared by the staff of the Financial Publishing Company, recognizes that Washington's IPFCA provides for 10 percent add-on interest. *Id.* at WA-01 (1991).

Our legislature enacted the IPFCA in 1969, at or about the same time that the insurance premium finance industry was lobbying for similar legislation around the country on the basis that general usury statutes were making the business unprofitable. *See* Frank A. Valenti, Comment, *Insurance Premium Financing*, 19 BUFF. L. REV. 656, 660-61 (1970). Thus, although the legislative history of Washington's IPFCA is scant, we think it highly unlikely that our legislature failed to recognize that by expressing the service charge for insurance premium financing in terms of a ratio of "ten dollars per one hundred dollars per year" it was authorizing a 10 percent add-on rate, rather than simple interest of 10 percent on the declining balance of the premium financing loan. Moreover, we doubt that it is coincidental that a number of other states have premium financing statutes that are identical in all material respects to Washington's, including but not limited to Florida (FLA. STAT. ANN. § 627.840(3)(a), (3)(b) (West Supp. 2002); Georgia (GA. CODE ANN. § 33-22-9(c), (d) (Supp. 2002); Delaware (DEL. CODE ANN. title 18, § 4807(b), (c) (1999)); Alabama (ALA. CODE § 27-40-9(b)(1), (b)(2) (1998)); and the District of Columbia (D.C. CODE ANN. § 31-1109(b), (c) (2001)). The District of Columbia's premium financing statute was construed by the bankruptcy court in *In re Auto-Train Corp.*, 9 B.R. 159 (Bankr. D.D.C. 1981). The plaintiff in that case claimed that certain premium finance agreements were invalid because they charged service charges above that allowed by the premium financing statute. The bankruptcy court determined that the District of Columbia's premium financing statute authorized add-on interest. *Id.* at 163 n.11 (court conducted an add-on calculation to illustrate allowable service charges).

RDI nevertheless argues that the legislature did intend to authorize only simple interest of 10 percent on the declining balance. RDI reasons that the legislature simply could not have intended to authorize add-on interest because it failed to provide for a refund to the borrower of unearned interest in the event of prepayment of the loan or premature cancellation of the insurance policy: "The fact that the IPFCA does not include such protections for insureds is compelling evidence that the Washington Legislature did not intend for premium finance companies doing business in this state to compute service charges by the [add-on] method advocated by Cananwill." Appellant's Opening Br. at 9. The problem with this argument is that our legislature *did* provide such protection for insureds. RCW 48.56.120 provides:

> (1) Whenever a financed insurance contract is canceled, the insurer shall return whatever gross unearned premiums are due under the insurance contract to the premium finance company *for the account of the insured or insureds.*
>
> (2) In the event that the crediting of return premiums to the account of the insured results in a surplus over the amount due from the insured, *the premium finance company shall refund such excess to the insured:* PROVIDED, That no such refund shall be required if it amounts to less than one dollar.

(Emphasis added.) *See also* RCW 48.56.090(3): "The service charge shall be a maximum of ten dollars per one hundred dollars per year plus an acquisition charge of ten dollars per premium finance agreement which need not be refunded upon cancellation or prepayment." Although RDI argues otherwise, we conclude that it is only the $10 acquisition charge that need not be refunded in the event of cancellation or prepayment. To construe this sentence to mean that *neither* the unearned interest nor the $10 acquisition charge need be refunded in the event of cancellation or prepayment would fly in the face of the refund provisions of RCW 48.56.120. We also note that RCW 48.56.080(5) provides that "[p]remiums advanced by a premium finance company are funds belonging to the insured and shall be

held in a fiduciary relationship." The premium finance company has a security interest in the unearned premiums by virtue of the assignment contained in the premium finance agreement as provided by RCW 48.56.020(2). But it takes any refund of unearned premiums "for the account of the insured or insureds" as required by RCW 48.56.120(1), and must credit the return premiums "to the account of the insured," with any surplus over the amount due from the insured of a dollar or more to be refunded to the insured as provided by RCW 48.56.120(2). None of these provisions is consistent with RDI's proposed reading of RCW 48.56-.090(3).

Moreover, there would be no unearned interest to refund to the insured if our legislature had intended the service charge to be based on simple interest on the declining balance of the loan:

> Where simple interest is charged there is no unearned interest since interest is paid only as it accrues, and then on a declining principal balance. . . . If a monetary obligation at simple interest is prepaid there is no refund of unearned interest (or finance charge) by the obligee, since there is none. Interest is paid each month only on the principal balance remaining.
>
> If we adopted appellant's interpretation of [Maryland's retail installment sales law] requiring that the finance charge be calculated by using the simple interest method, [the section of the law requiring that unearned finance charges be rebated to the buyer] would be a meaningless provision. [That section] clearly refers to the refund of a finance charge calculated on the add-on basis.

*Dear v. Holly Jon Equip. Co.*, 283 Pa. Super. 74, 423 A.2d 721, 724 (1980); KEEST ET AL., *supra*, at 127 ("Because add-on interest is precomputed, the note or contract should contain an agreement as to how unearned interest will be rebated in the event of prepayment.").[2]

---

[2] The parties have not provided us with a copy of the premium financing agreement in the record on appeal, probably because they are contesting the meaning of the IPFCA and not the financing agreement. Cananwill claims that it

We note with considerable interest that our reading of the refund provisions of the IPFCA comports with apparent industry practice as illustrated by the facts in *In re Krimbel Trucking Co.*, 3 B.R. 4 (Bankr. W.D. Wash. 1979). There, a trucking company was adjudicated bankrupt, and its insurance policy was cancelled before the premium was fully earned. The premium had been paid by AFCO Credit Corporation under a premium financing agreement. The unearned premium was refunded to AFCO and credited by it to the account of the trucking company, as required by RCW 48.56.120(1). AFCO then paid the surplus over to the trustee in bankruptcy, consistent with its obligations under RCW 48.56.120(2). The trustee sought recovery of the entire refund, not just the surplus, on the theory that AFCO had not perfected its lien under article 9 of the Uniform Commercial Code. The bankruptcy court rejected this contention, based on the assignment of unearned premiums contained in the premium financing agreement and the lien perfection and refund provisions of the IPFCA. The court also noted that another statute, RCW 48.18.290, required that unearned premiums be refunded to the insured or other person entitled thereto as shown by the policy. *Id.*

In sum, we conclude that the IPFCA authorizes insurance premium finance companies to charge 10 percent add-on interest on the balance of the premiums due (after subtracting the down payment made by the insured in accordance with the premium finance agreement) from the effective date of the insurance coverage for which the premiums are being advanced, to and including the date when the final installment of the premium finance agreement is payable. It is true that this results in significantly higher interest on the loan than would be the case if only simple interest were charged on the declining balance. However, the statute requires the premium finance company to refund any unearned interest to the insured if the policy is cancelled before the premium is fully earned, or if

does refund unearned interest in the event of prepayment or premature cancellation of the insurance policy. Resp't's Br. at 19 n.8; Clerk's Papers at 175.

the premium finance loan is prepaid. As RDI itself points out, many small businesses with limited working capital must rely upon insurance premium finance companies because they cannot afford to pay lump sum insurance premiums. Our legislature made a policy decision to permit add-on interest in spite of the higher cost to insureds, probably in response to industry lobbying, but probably also to insure that insurance premium financing would remain available to small businesses in Washington.[3] Any continuing concern that RDI may have about the high cost of such financing should be addressed to the legislature, not to the courts. The trial court did not err in granting summary judgment to Cananwill on this issue.

██ ██ RDI's contention that by violating the IPFCA Cananwill also violated the CPA is mooted by our ruling that Cananwill did not violate the IPFCA. The CPA grants a cause of action to private claimants who can show: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) that causes injury to the claimant in its business or property, and (5) that the injury is causally linked to the unfair or deceptive act. RCW 19.86.020; *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). But RCW 19.86.170 expressly provides that "nothing required or permitted to be done pursuant to Title 48 RCW

---

[3] We note that there apparently is some degree of competitive marketing among insurance premium financing companies, in that the service charge imposed in this case was actually some $400 less than would have been permitted under the IPFCA:

| | |
|---|---|
| $16,390.01 | balance of premiums due after subtracting down payment |
| times 10/100 | ten dollars times one hundred dollars |
| times 308 | 308 days from November 1, 1996 to September 4, 1997 |
| divided by 365 | (using 365 day year) |
| Equals $1,383.05 | (maximum permissible precomputed interest) |
| Plus $10.00 | acquisition charge |
| Equals $1393.05 | Total permissible service charge under statute |
| $992.35 | Actual service charge in this case |

Calculations shown in Respondent's Brief at 6. *See* RCW 48.56.090 (setting out the formula by which these calculations were made).

shall be construed to be a violation of RCW 19.86.020." The IPFCA is part of Title 48 RCW. Cananwill did nothing with regard to its financing arrangement with RDI that is not required or permitted to be done under the IPFCA. Thus, Cananwill did not violate RCW 19.86.020. The trial court did not err by granting summary judgment to Cananwill on this issue.

Affirmed.

GROSSE and ELLINGTON, JJ., concur.

Review granted at 149 Wn.2d 1010 (2003).