80 P.3d 598 (2003)
150 Wash.2d 674
RESTAURANT DEVELOPMENT, INC., a Washington corporation, individually and on behalf of all others similarly situated, Petitioner,
v.
CANANWILL, INC., a California corporation, Respondent.
No. 73298-1.
Supreme Court of Washington, En Banc.
Argued September 11, 2003.
Decided December 11, 2003.
*599 Paul F. Norris, Bradford Avery Steiner, Seattle, for petitioner.
Nicholas Peter Gellert, Seattle, for respondent.
OWENS, J.
Cananwill, Inc., financed an insurance premium for Restaurant Development, Inc. (RDI) and charged an add-on interest rate calculated at the outset of the loan, which amounted to a 13 percent effective annual percentage rate (APR). RDI argues that the Insurance Premium Finance Company Act (IPFCA), chapter 48.56 RCW, allows insurance premium finance companies to charge no more than 10 percent actuarial (simple) interest calculated monthly on the declining principal of the loan. This amounts to a 10 percent effective APR. Based on its interpretation of IPFCA, RDI contends that Cananwill's 13 percent effective APR violated IPFCA and resulted in a Consumer Protection Act (CPA), chapter 19.86 RCW, violation. In light of the plain language and legislative history of the statute, we hold that Cananwill did not violate IPFCA and RDI's CPA claim is moot.

FACTS
RDI is a restaurant management company that was created to operate Moe's Mo-Roc-N Café, a nightclub. In 1996, RDI decided to purchase its insurance from Crusader Insurance Co. for a total of $19,747. Like many small businesses, RDI chose not to pay the annual premium with a single, lump sum payment. Instead RDI entered into an insurance premium finance agreement with Cananwill. Under this agreement, RDI made a down payment and financed the rest of the obligation through Cananwill. Cananwill paid the lump sum to Crusader and RDI agreed to repay Cananwill over the course of several months. RDI chose a specific payment plan, which included a precomputed, "add-on" interest rate. The add-on interest rate did not take into account the fact that the principal would decline as payments were made. RDI signed an insurance premium installment payment agreement, which set forth these terms and expressly stated that the effective APR under this payment plan would be 13 percent. Payments were completed according to the agreement.
In May 2000, RDI filed this class action lawsuit, claiming that Cananwill had violated *600 the CPA by imposing service charges above the maximum rate set forth in IPFCA. Both parties moved for summary judgment in September 2001. The trial court read IPFCA in favor of Cananwill and granted summary judgment on Cananwill's motion, dismissing the claim. The Court of Appeals concluded that the statutory language of RCW 48.56.090(3), setting the maximum service charge at "ten dollars per one hundred dollars per year," allows insurance premium finance companies to charge add-on interest, rather than simple interest calculated on the declining principal. Rest. Dev., Inc. v. Cananwill, Inc., 114 Wash.App. 194, 198-99, 55 P.3d 680 (2002). The Court of Appeals noted that other state courts and industry publications have interpreted comparable language to refer to the add-on calculation. Id. at 199-200, 55 P.3d 680. Moreover, the circumstances surrounding IPFCA's enactment support this interpretation. Id. at 200, 55 P.3d 680.
The Court of Appeals also read RCW 48.56.120 to require a refund of both unearned premiums and unearned interest in the event of cancellation. Id. at 201-02, 55 P.3d 680. The simple interest method charges interest as it is earned based on the declining principal, resulting in no prepayment of interest. Id. at 202, 55 P.3d 680. Therefore, the court concluded that RCW 48.56.120's refund requirement must indicate that the statutory maximum service charge allowed add-on interest because otherwise the refund provision would be unnecessary. Id. at 203-04, 55 P.3d 680. Finally, because there was no violation of IPFCA, RDI's CPA claim was rendered moot. Id. at 204, 55 P.3d 680.

ISSUE
Should the maximum allowable service charge under IPFCA be calculated as an add-on interest rate or an actuarial (simple) interest rate?

ANALYSIS

A. Add-On Interest Versus Simple Interest
To inform our discussion, we begin our analysis with a brief summary of how simple interest and add-on interest work when applied to installment transactions. The simple interest method requires calculating the finance charge "by applying a periodic interest rate to the outstanding balance of the unpaid principal [upon] every repayment period for the term of the loan." KATHLEEN E. KEEST & ELIZABETH RENUART, NAT'L CONSUMER LAW CTR., THE COST OF CREDIT: REGULATION AND LEGAL CHALLENGES § 4.3.1.1, at 121 (2d ed.2000) (emphasis omitted). In order to arrive at a consistent monthly payment amount, complex calculations must be made to predict the interest due at each payment on the declining principal. See id. at 122-24. The end result is that, for every payment made, the accumulated finance charge for that payment period is paid first, and any remainder is subtracted from the outstanding balance of the debt. Id. at 122. Because interest is paid as it is earned, if the term of the loan is abbreviated by prepayment or other circumstances, there is rarely unearned interest that must be returned to the debtor. Id. § 5.5.1, at 182-83.
Before the widespread use of computers, add-on or precomputed interest was a common method used for installment transactions because it avoided the complex calculations necessary for simple interest. Id. § 4.3.2, at 127. In computing add-on interest, the interest charges are applied to the entire principal amount for the entire term, regardless of the declining principal. Id. Further, "many add-on interest rate statutes do not use the words `add-on' to describe the rates therein. They may, for example, use such terms as `$8.00 per $100 per annum' to describe an 8% add-on rate." Id. at 129. "Because add-on interest is precomputed, the note or contract should contain an agreement as to how unearned interest will be rebated in the event of prepayment." Id. at 127. Moreover, "most state laws governing consumer credit transactions have long required that unearned interest and other unearned charges be rebated when a precomputed contract is terminated early." Id. § 4.5.3, at 146.

B. The Refund Provision
As an initial matter, it is helpful to dispense with the significance of the refund *601 provision, RCW 48.56.120, which was central to the Court of Appeals' resolution of this case. Rest. Dev., Inc., 114 Wash.App. at 201-04, 55 P.3d 680. RCW 48.56.120 clearly states that, upon cancellation of the insurance contract, the insurance company must refund the unearned portion of the premium to the insurance premium finance company for the account of the insured. In turn, the premium finance company must refund any "surplus over the amount due" to the insured. RCW 48.56.120(2).
The Court of Appeals seems to have read the reference to "surplus over the amount due" to necessarily include unearned interest. Rest. Dev., Inc., 114 Wash.App. at 201-02, 55 P.3d 680. However, the language of RCW 48.56.120 does not plainly state that any refund will include unearned interest in the event of cancellation; it only specifically refers to a refund of unearned premiums. While this refund provision may contemplate a refund of both unearned premiums and interest, the provision does not do so clearly enough to end our inquiry.
In a related argument, RDI contends that the legislature clearly intended there to be no refund of service charges or acquisition charges. RDI bases its conclusion on language in RCW 48.56.090 which states:
The service charge shall be a maximum of ten dollars per one hundred dollars per year plus an acquisition charge of ten dollars per premium finance agreement which need not be refunded upon cancellation or prepayment.

RCW 48.56.090(3) (emphasis added). Conversely, Cananwill argues that only the acquisition charge "need not be refunded," indicating by negative implication that the service charge does need to be refunded upon cancellation or prepayment. Ultimately, it is unclear whether it is the entire service charge or only the acquisition charge that "need not be refunded." Because this clause does not rise to the level of clarity found in other states' refund provisions,[1] we instead rely on the language and legislative history of the statutory maximum clause.[2]

C. Statutory Interpretation of IPFCA
The central issue in this case is the interpretation of the IPFCA maximum service charge provision. The interpretation of a statute is a question of law, subject to de novo review. State v. J.P., 149 Wash.2d 444, 449, 69 P.3d 318 (2003). When called upon to interpret a statute, our primary obligation is to give effect to the legislature's intent. Lacey Nursing Ctr. v. Dep't of Revenue, 128 Wash.2d 40, 53, 905 P.2d 338 (1995). Our review always begins with the plain language of the statute. Id. In determining plain meaning, we may look to "`all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question.'" J.P., 149 Wash.2d at 450, 69 P.3d 318 (quoting Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11, 43 P.3d 4 (2002)).
Further, a court must not add words where the legislature has chosen not *602 to include them. A court also must construe statutes such that all of the language is given effect, and "`no portion [is] rendered meaningless or superfluous.'" Id. (quoting Davis v. Dep't of Licensing, 137 Wash.2d 957, 963, 977 P.2d 554 (1999)). If a statute is subject to more than one reasonable interpretation, this court may look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent. See Philip A. Talmadge, A New Approach to Statutory Interpretation in Washington, 25 SEATTLE U.L.REV. 179, 203 (2001).

1. Plain Language
IPFCA was passed in 1969, before the widespread use of computers, and most of the chapter remains unchanged. RCW 48.56.020(2) allows for a service charge to be included in the premium finance agreement:
"Premium finance agreement" means an agreement by which an insured ... promises to pay to a premium finance company the amount advanced ... under the agreement to an insurer ... in payment of premiums on an insurance contract together with a service charge as authorized and limited by this chapter and as security therefor the insurance premium finance company receives an assignment of the unearned premium.
IPFCA also provides for a maximum service charge:
(1) A premium finance company shall not charge, contract for, receive, or collect a service charge other than as permitted by this chapter.
(2) The service charge is to be computed on the balance of the premiums due (after subtracting the down payment made by the insured in accordance with the premium finance agreement) from the effective date of the insurance coverage, for which the premiums are being advanced, to and including the date when the final installment of the premium finance agreement is payable.
(3) The service charge shall be a maximum of ten dollars per one hundred dollars per year plus an acquisition charge of ten dollars per premium finance agreement which need not be refunded upon cancellation or prepayment.
RCW 48.56.090 (emphasis added).
A survey of state statutes that impose maximum finance charges reveals that the formula, "maximum of x dollars per one hundred dollars per year," can be characterized as a term of art whose use consistently, and perhaps exclusively, denotes the add-on calculation.[3]See KEEST & RENUART, supra, § 4.3.2, at 129 ("many add-on interest rate statutes do not use the words `add-on' to describe the rates therein. They may, for example, use such terms as `$8.00 per $100 per annum' to describe an 8% add-on rate.").
Further, various courts have construed statutes similar to Washington's to create maximum rates according to the add-on calculation. In Auto-Train, 9 B.R. at 163, a federal bankruptcy court applied a statute identical in all relevant respects to RCW 48.56.090. The statute in question limited the allowable service charge to "`$6.00 per $100 per year, plus an additional charge of $10 per Premium Finance Contract which need not be refunded upon cancellation or prepayment.'" Id. n. 11 (quoting 35 *603 D.C.Code § 1369). The Auto-Train court calculated the maximum allowable finance charge according to the add-on method. Id. Moreover, in a case decided in the same year that IPFCA was enacted, the Minnesota Supreme Court interpreted a maximum finance charge of "$8 per $100 per year." Ruona v. Freeway Dodge, Inc., 285 Minn. 23, 171 N.W.2d 212, 214 (1969). The Ruona court stated:
The legislature, however, chose to express the maximum authorized finance charges in terms of a ratio of dollars per hundred dollars per year. This is commonly known in the finance industry as an "add-on" rate.
Id. at 216.
RDI has not pointed to any case interpreting a statute using the formula "x dollars per one hundred dollars per year," in which the court found that language to require anything other than an add-on calculation.[4]See In re Armstrong, 288 B.R. 404, 425-26 (Bankr.E.D.Pa.2003) (calculating a maximum of $8 per $100 per annum as add-on); In re Corcoran, 268 B.R. 882, 886 (Bankr.M.D.Fla. 2001) (interpreting maximum of $17 per $100 per year to contemplate add-on calculation); Yates Ford, Inc. v. Ramirez, 692 S.W.2d 51, 53-54 (Tex.1985) (interpreting "$7.50 per $100 per annum" to set a maximum "add-on" interest rate); Centennial Assocs., Ltd. v. Clark, 384 So.2d 616, 617 (Ala.1980) (interpreting $8 per $100 terminology to mean the "add-on" calculation, not "simple interest"); Falcone v. Palmer Ford, Inc., 242 Md. 487, 219 A.2d 808, 814 (1966); Van Asperen v. Darling Olds, Inc., 254 Minn. 62, 93 N.W.2d 690, 697-98 (1958). Although each of these courts also referred to relevant surrounding statutory language, these cases speak to the consistency with which this formula denotes the add-on calculation.
Additionally, references to commercial terms should be given the meaning commonly used in the regulated industry, absent clear legislative intent to the contrary. See City of Spokane, ex rel. Wastewater Mgmt. Dep't v. Dep't of Revenue, 145 Wash.2d 445, 452, 38 P.3d 1010 (2002); 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 47:31, at 366-67 (6th ed.2000). In using "x dollars, per one hundred dollars per year," the various state legislatures that have employed that terminology may have recognized a standard practice in the finance industry. Rest. Dev., Inc., 114 Wash.App. at 199, 55 P.3d 680 ("[A] finance charge expressed `in terms of a ratio of dollars per hundred dollars per year' is `commonly known in the finance industry as an "add-on" rate.'") (quoting Ruona, 171 N.W.2d at 216). Moreover, it appears the industry has interpreted Washington's insurance premium finance maximum rate as "10% add-on plus flat $10." FIN. PUBL'G CO. (PUBLICATION NO. 830), THE COST OF PERSONAL BORROWING IN THE UNITED STATES WA-01, Foreword (1991) (interpreting and noting that "[i]n general the figures in this book will be based on the way things are done [in the industry].").
In addition to employing this term of art, the Washington State Legislature also defined the manner in which the service charge should be calculated:
The service charge is to be computed on the balance of the premiums due (after subtracting the down payment made by the insured in accordance with the premium finance agreement) from the effective date of the insurance coverage, for which the premiums are being advanced, to and including the date when the final installment of the premium finance agreement is payable.
RCW 48.56.090(2). RDI argues that because RCW 48.56.090(2) does not require computation of the service charge based on the "original" amount financed, the simple interest method is required.[5] However, RDI ignores the parenthetical definition of "balance of the *604 premiums due," specifically, "(after subtracting the down payment made by the insured in accordance with the premium finance agreement)," which accomplishes the same result. This provision does not direct calculation of the service charge based on the unpaid balance, but instead indicates that the service charge should be computed based on the balance after subtracting the down payment. In fact, this language is common in statutes that refer to the add-on calculation.[6]
Similarly, RDI argues that the time for calculating the service charge, namely "from the effective date of the insurance coverage, for which the premiums are being advanced, to and including the date when the final installment of the premium finance agreement is payable," RCW 48.56.090(2), requires periodic calculation of interest charges on the declining balance. But this clause simply establishes the time period over which the interest rate must be calculated, which is a necessary element of the add-on formula.[7]
In sum, the plain language of RCW 48.56.090, "[x] dollars per one hundred dollars per year," is a term of art, whose use consistently refers to the add-on method for calculating service charges. RCW 48.56.090(2) instructs insurance premium finance companies to calculate the service charge after subtracting the down payment, but not on a periodic basis. Therefore, the plain language of the statute supports calculating service charges by using an add-on method.

2. Legislative History
The circumstances surrounding the 1969 enactment of IPFCA also support the add-on interpretation. A commentator, writing just after the enactment of IPFCA, reflected upon the then recent boom in the insurance premium financing business and the need for effective regulation. Frank A. Valenti, Comment, Insurance Premium Financing, 19 BUFF. L.REV. 656, 660-61 (1970). He noted that many legitimate premium finance agencies were seeking legislation because state usury statutes were often unduly restrictive when applied to this industry. The typical small account size meant that usury rates would render the business unprofitable.[8]Id. at 661.
As a result, there was a "movement from within the industry for authorization of a rate which would yield a return more in line with that of other businesses." Id. In fact, several state premium finance laws, enacted during the same general time period, include language that is very similar to Washington's.[9] This legislative history may explain why the legislature would have allowed an add-on calculation method for this industry, even though it results in a higher effective APR than the simple interest calculation.

CONCLUSION
Based on a reading of the plain language and legislative history of the statute, we hold that the IPFCA maximum service charge provision allows interest to be calculated using the add-on method. We recognize that *605 the add-on method may not provide the consumer protection intended by the legislature because this method may result in a significantly higher rate of interest than the average consumer is accustomed to paying.[10] However, ultimately it is for the legislature and not the courts to "strike the balance between protecting the consumer and permitting legitimate finance companies to earn a profitable return." Ruona, 171 N.W.2d at 218. We trust that the legislature will take appropriate legislative action if current premium finance practices require correction.
Based on our holding, Cananwill did not violate IPFCA by charging RDI an add-on interest rate calculated at the outset of the loan. The Court of Appeals correctly concluded that, absent an IPFCA violation, RDI's CPA claim is moot. Therefore, we affirm the Court of Appeals.
WE CONCUR: ALEXANDER, C.J., JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, CHAMBERS and FAIRHURST, JJ.
NOTES
[1] See, e.g., OHIO REV.CODE ANN. § 1321.79(D) (Anderson 2002) ("[A]ny insured may prepay his obligation under a premium finance agreement in full at any time before the final payment is due. In such event any unearned finance charge shall be refunded by the insurance premium finance company. The amount of any refund shall be calculated in accordance with the ... `rule of 78.'" Early cancellation results in an identical calculation.); see also ALA.CODE § 27-40-9(c) (1998) (insurance premium financing); ARIZ.REV. STAT. ANN. § 44-1205 (West 2003) (miscellaneous loan provisions); DEL.CODE ANN. tit. 18, § 4807(d) (1999) (insurance premium financing); FLA. STAT. ANN. § 627.840 (West 2003); GA.CODE ANN. § 33-22-9 (2002); KAN. STAT. ANN. § 40-2610 (2000) (insurance premium financing); KY.REV.STAT. ANN. § 190.120 (Michie 2002) (motor vehicle sales); MINN.STAT. ANN. § 59A.09 (West 2003) (insurance premium financing); MO. ANN. STAT. § 364.120(4) (West 2003) (premium financing); N.Y. BANKING LAW § 568(4)(a) (McKinney 2001) (insurance premium financing); PA. STAT. ANN. tit. 7, § 309(g) (West 2003) (installment loans).
[2] It should be noted that the absence of a refund calculation provision does not necessarily mean the legislature did not intend the add-on rate. Instead, the legislature may have chosen to leave the refund calculation for the parties to negotiate by contract. See KEEST & RENUART, supra, § 4.3.2, at 127; see, e.g., 215 ILL. COMP. STAT. 5/513a10(d) (2002) (premium finance) (service charge does not have to be refunded upon cancellation or repayment); In re Auto-Train Corp., 9 B.R. 159, 163 (Bankr.D.C.1981) (calculating "$6.00 per $100.00 per year" as add-on in the absence of a refund calculation provision).
[3] ALA.CODE § 27-40-9 (1998) (insurance premium finance); DEL.CODE ANN. tit. 18, § 4807 (1999) (insurance premium financing); FLA. STAT. ANN. § 627.840 (West 2003) (insurance premium financing); GA.CODE ANN. § 33-22-9 (2002); KAN. STAT. ANN. § 40-2610 (2002) (insurance premium financing); KY.REV.STAT. ANN. § 190.120 (Michie 2002) (motor vehicle installment sales); MINN. STAT. ANN. § 59A.09 (West 2003) (insurance premium financing); MO. ANN. STAT. § 364.120 (West 2003) (premium financing); N.Y. BANKING LAW § 568(4)(a) (McKinney 2001) (insurance premium financing); OHIO REV.CODE ANN. § 1321.79 (Anderson 2002) (insurance premium financing); PA. STAT. ANN. tit. 7, § 309 (West 2003) (installment loans); TEX. FIN.CODE ANN. § 342.201 (Vernon 2003) (consumer loans); see also Centennial Assocs., Ltd. v. Clark, 384 So.2d 616, 617 (Ala. 1980) (interpreting ALA.CODE § 5-19-3(a) to mean "add-on" calculation, not "simple interest" calculation). The statutes that do not specifically state that the statute provides for an add-on calculation have clear refund provisions, indicating that they are add-on statutes. See supra note 1 (listing statutes with clear refund provisions); KEEST & RENUART, supra, § 5.5.1, at 182-83 (explaining that a refund is necessary in precomputed transactions if the consumer prepays, but in interest bearing transactions there is generally no interest to rebate).
[4] In contrast, states often use language like "x percent per year" to describe the simple interest method for calculating service charges. See, e.g., COLO.REV.STAT. ANN. § 5-2-201 (West 2002) (consumer credit); FLA. STAT. ANN. § 627.901 (West 2003) (premium financing); IND.CODE ANN. § 24-4.5-2-201 (Michie 2002) (credit sales); IOWA CODE ANN. § 537.3210 (West 2003) (consumer credit); ME.REV.STAT. ANN. tit. 9-A, § 2-201 (West 2003) (consumer credit); WIS. STAT. ANN. § 138.09 (West 2002) (precomputed loan law).
[5] See, e.g., ALA.CODE § 5-19-3 (2002) (consumer finance); PA. STAT. ANN. tit. 7, § 309 (West 2003) (installment loans) (using "original principal").
[6] ALA.CODE § 27-40-9 (1998); DEL.CODE ANN. tit. 18, § 4807 (1999); FLA. STAT. ANN. § 627.840 KAN. § 40-2610 (2000); MINN.STAT. ANN. W§ 59A.09 (West 2003); MO. ANN. STAT. § 364.120(2), (3) (West 2003); OHIO REV.CODE ANN. § 1321.79 (Anderson 2002). All are insurance premium financing statutes. See supra note 3 (explaining why these statutes are considered to be add-on statutes). See also Auto-Train, 9 B.R. at 163 (interpreting what is currently D.C.CODE ANN. § 31-1109 as add-on).
[7] See ALA.CODE § 27-40-9 (1998); DEL.CODE ANN. tit. 18, § 4807 (1999); FLA. STAT. ANN. § 627.840 (West 2003); GA CODE ANN. § 33-22-9 (2002); KAN. STAT. ANN. § 40-2610 (2000); MINN.STAT. ANN. § 59A.09 (West 2003); MO. ANN. STAT. § 364.120 (West 2003); OHIO REV.CODE ANN. § 1321.79 (Anderson 2002). See supra note 3 (explaining why these statutes are considered to be add-on statutes). See also Auto-Train, 9 B.R. at 163 (interpreting what is currently D.C.CODE ANN. § 31-1109 as add-on).
[8] In contrast, Keest notes that high interest rates are generally unnecessary in these types of transactions because they involve relatively risk free loans. See KEEST & RENUART, supra, § 2.3.3.6, at 55.
[9] ALA.CODE § 27-40-9 (enacted 1975); GA.CODE ANN. § 33-22-9 (enacted 1969); KAN. STAT. ANN. § 40-2610 (enacted 1968); MINN.STAT. ANN. § 59A.09 (enacted 1974); OHIO REV.CODE ANN. § 1321.79 (enacted 1969).
[10] Here the effective APR was 13 percent. However, during argument counsel conceded that an effective APR using the add-on method could be as high as 17.25 percent.