# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY, | No. 59809-4-II |
| Respondent, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — The Washington State Department of Revenue (Department) appeals the trial court's entry of summary judgment in favor of Chicago Title Insurance Company (Chicago Title). The Department argues that the trial court erroneously concluded that Chicago Title's remote title insurance and escrow services were sourced to its out-of-state branch offices under RCW 82.32.730(1)(a). Because the plain language of the statute unambiguously supports that the sales should have been sourced to Washington under RCW 82.32.730(1)(b), we reverse and remand with instructions to enter summary judgment in the Department's favor.

FACTS

I.    BACKGROUND

The parties do not dispute the underlying facts for this case. Chicago Title operates "a national title insurance [and escrow service] company that provides title insurance, abstract, and escrow services in connection [with] the sale or refinancing of real property." Clerk's Papers (CP)

at 53. Title insurance is a form of insurance that "insures against the risk . . . [of] defects in the title to real property or in the lien priority of a mortgage on real property." CP at 53. Abstract services entail a "review of title records impacting the subject property," which culminates in a report "guaranteed by the title insurance policy." CP at 53. And escrow services focus on the collection and disbursement of "funds and transaction documents for a real property sale or financing in accordance with escrow instructions." CP at 54.

Historically, Chicago Title operated out of local branch offices throughout the United States, including Washington. Chicago Title provided its services in person. This was attributable to the fact that many of the property records relevant to these services were "kept at the county level" where the real property was located. CP at 386.

But Chicago Title's practices, along with the rest of the title insurance industry, changed with the advancement of technology. Rather than relying on county offices to retrieve relevant documents, companies like Chicago Title could utilize electronic databases, meaning they could provide services at remote, out-of-state locations.

With the ability to provide services remotely, Chicago Title now conducts its business through "Direct" and "Agency" (or indirect) operations. CP at 54. When Chicago Title conducts its business through "Direct Operations," Chicago Title itself "performs the abstract services and directly issues the title insurance policy." CP at 54. Chicago Title will usually provide the escrow services through its "Direct Operations." CP at 54. Chicago Title generates its income through insurance premiums, "which covers both the abstract service/title report and the insurance guaranty," as well as a separate fee for escrow services. CP at 54.

But through its "Agency Operations," or "indirect" business, Chicago Title provides services through its affiliated agencies. CP at 56. These affiliated agencies include ServiceLink,

2

located in Pennsylvania, and Fidelity National Agency Solutions (FNAS), "headquartered in Texas with offices [in] California and New Jersey." CP at 55. Both ServiceLink and FNAS perform "the abstract service with [Chicago Title] only underwriting the title policy issued by the agent." CP at 56. As such, ServiceLink and FNAS remit "a portion of the premium" charged for the services, "generally 10% to 15%[,] . . . to compensate [Chicago Title] for underwriting the policy." CP at 56.

"Neither ServiceLink nor FNAS have any offices in Washington," meaning that services handled by these entities occur "outside [of] Washington, regardless of where the property involved [is] located." CP at 55. Purchasers of ServiceLink's or FNAS's services never went to a branch office outside of Washington to meet in person; they solely interacted with the service remotely.

II.     CHICAGO TITLE'S AUDIT

In 2010, Chicago Title "began transitioning its non-commercial Direct Operations into affiliated agencies." CP at 55. For Washington, the "transition was substantially completed in July 2011." CP at 55. Because Chicago Title transferred most of its business to Agency Operations, it reported less gross income the following years, ultimately decreasing to $0 in 2012.[1] The vice president and "Regional Controller for Pacific Northwest Accounting Operations for Chicago Title" later explained in a deposition that Chicago Title "chose not to collect and remit sales tax on its sales of title insurance and escrow services to Washington property owners" during the Audit Period because "[n]one of the work was being prepared in Washington." CP at 53, 770.

---

[1] During the Audit Period, "Chicago Title reported Washington sales tax and retailing [business and occupation (B&O)] tax on Direct Operations based on the closing location," which was allegedly "consistent with the Department's own, longstanding interpretation of RCW 82.32.730." CP at 54.

And the representative for Chicago Title also acknowledged that all of the disputed income related "to title insurance [services] . . . for Washington real property." CP at 764.

In 2015, the Department audited Chicago Title for the period January 1, 2009, through December 31, 2012 (Audit Period). During the Audit Period, Chicago Title generated $104,498,075 in gross income for its "Direct Operations business" in Washington. CP at 55. And Chicago Title also made $19,454,201 in gross income through the "share of premiums from Agency Operations." CP at 56. The Department ultimately assessed $8,310,134 against Chicago Title for unpaid retail, business and occupation (B&O), and use taxes.

III.     PROCEDURAL HISTORY

Chicago Title appealed the Department's assessment to the Department's Administrative Review and Hearings Division (ARHD). The ARHD affirmed Chicago Title's petition in part, reducing the Department's assessment by $45,814. Chicago Title sought reconsideration, but the ARHD denied the petition.

In December 2018, Chicago Title remitted the amount assessed by the Department and filed an appeal with the Thurston County Superior Court. Following discovery, both parties moved for summary judgment.

At the hearing to consider the parties' motions for summary judgment, the trial court orally ruled in Chicago Title's favor. The court concluded that "Chicago Title's insurance premium and escrow fee income" were properly sourced to the remote, out-of-state office locations under RCW 82.32.730(1)(a). 1 Rep. of Proc.(RP) at 30.

In July 2024, the trial court entered a final judgment for Chicago Title, ordering the Department to refund Chicago Title $10,909,764.10.

The Department appeals.

ANALYSIS

The Department argues that the trial court erred by concluding that Chicago Title's sales involving Washington real property were sourced to the out-of-state offices operated by Chicago Title's affiliated agencies under RCW 82.32.730(1)(a). More specifically, the Department argues that the court erred because RCW 82.32.730(1)(a) does not apply to remote transactions, and under subsection (b), the sales should be sourced to Washington because purchasers "receive" or "make first use of" Chicago Title's services in Washington. Chicago Title argues that the trial court properly sourced the sales out-of-state under RCW 82.32.730(1)(a) because the statute does not require a physical presence at the business location of the seller, and a purchaser receives the services at the closing office. We agree with the Department.

I.      LEGAL PRINCIPLES

We review orders granting summary judgment de novo, "'engag[inga] in the same inquiry as the trial court.'" *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014) (internal quotation marks omitted) (alteration in original) (quoting *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000)). "A court may grant summary judgment if the pleadings, affidavits, and depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000); CR 56(c). A material fact is a "'fact upon which the outcome of the litigation depends, in whole or in part.'" *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979) (quoting *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974)). We view all submitted facts and reasonable inferences in the light most favorable to the nonmoving party. *Hunt*, 181 Wn.2d at 140.

Determining whether Chicago Title's services were properly sourced under RCW 82.32.730(1)(a) requires statutory interpretation. "Interpretation of a statute is a question of law that we [also] review de novo." *Antio, LLC v. Dep't of Revenue*, 26 Wn. App. 2d 129, 135, 527 P.3d 164 (2023), *aff'd*, 3 Wn.3d 882, 557 P.3d 672 (2024). "The goal of statutory interpretation is to discern and implement the legislature's intent." *Thurman v. Cowles Co.*, 4 Wn.3d 291, 296, 562 P.3d 777 (2025).

When interpreting a statute, "[w]e first look to the statute's plain language, giving effect to the legislative intent" while also avoiding "unjust and absurd consequences." *AARO Med. Supplies, Inc. v. Dep't of Revenue*, 132 Wn. App. 709, 717, 132 P.3d 1143 (2006); *State v. Vela*, 100 Wn.2d 636, 641, 673 P.2d 185 (1983). We consider "the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." *Cashmere Valley Bank v. Dep't of Revenue*, 181 Wn.2d 622, 631, 334 P.3d 1100 (2014).

"If the statute defines a term, we must rely on that provided definition." *Cave Props. v. City of Bainbridge Island*, 199 Wn. App. 651, 656, 401 P.3d 327 (2017). When a term is undefined, we rely on its plain and ordinary meaning, and "[w]e may consult the dictionary to determine a term's plain meaning." *Clark County v. Portland Vancouver Junction R.R., LLC*, 17 Wn. App. 2d 289, 295, 485 P.3d 985 (2021). We do not "'add words where the legislature has chosen not to include them.'" *Porter v. Kirkendoll*, 194 Wn.2d 194, 212, 449 P.3d 627 (2019) (quoting *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003)).

If the statute is unambiguous, meaning it is only subject to one interpretation, our inquiry ends. *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009). If, however, a statute is "'susceptible to two or more reasonable interpretations,'" it is ambiguous. *Id.* at 452 (quoting *State v. Hahn*, 83 Wn. App. 825, 831, 924 P.2d 392 (1996)). In this scenario, "it

6

is appropriate to resort to aids [of] construction, including legislative history." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 12, 43 P.3d 4 (2002).

Retail sales that occur in the State of Washington are subject to a B&O tax and retail sales tax. RCW 82.04.250; RCW 82.08.020. Washington has historically engaged in an origin-based sourcing approach, meaning that for the purposes of tax liability, a transaction involving a service "occurred at the place at which such services were primarily performed." *See* former RCW 82.14.020 (2005). But that changed in 2007 when the legislature amended chapter 82.32 RCW to conform with the Streamlined Sales and Use Tax Agreement "to simplify and modernize sales and use tax administration in order to substantially reduce the burden of tax compliance for all sellers and for all types of commerce." RCW 82.58.030; LAWS OF 2007, ch. 6, § 501.

Now, all sales at retail are sourced in accordance with the limited options set out in RCW 82.32.730(1)(a)-(e). A "'sale at retail' or 'retail sale'" under RCW 82.32.730(1) includes "[a]bstract, title insurance, and escrow services." RCW 82.04.050(3)(a).

RCW 82.32.730(1) establishes a multi-step approach for determining the "source[]" of a retail sale. Under subsection (a), when a service is "received by the purchaser at a business location of the seller," then "the sale is sourced to that business location." RCW 82.32.730(1)(a). But under subsection (b) if a service "is *not* received by the purchaser at the business location of the seller, the sale is sourced to the location where receipt by the purchaser . . . occurs." RCW 82.32.730(1)(b) (emphasis added).

When neither subsection (a) or (b) apply, "the sale is sourced to the location indicated by an address for the purchaser that is available from the business records of the seller." RCW 82.32.730(1)(c). And if neither subsection (a), (b), or (c) apply, then "the sale is sourced to the location indicated by an address for the purchaser obtained during the consummation of the sale."

RCW 82.32.730(1)(d).  Only when none of the previous subsections apply is a sale sourced under subsection (e), which dictates that a sale is sourced "by the address from which . . . [the] service . . . was provided."  RCW 82.32.730(1)(e).  We observe that only subsection (e) provides for origin-based sourcing.[2]

II.     THE TRIAL COURT ERRED IN SOURCING THE SALES OUT OF STATE UNDER RCW 82.32.730(1)(a)

Here, because the underlying facts are undisputed by the parties, the issue before us is purely legal: where should Chicago Title's sales for services related to Washington real property be sourced under RCW 82.32.730.  When read in conjunction with subsection (b), the plain language of subsection (a) supports that the trial court erred in concluding these sales were sourced out of the state.  RCW 82.32.730(1)(a), (b).

For starters, the word "at" in both subsection (a) and (b) supports the need for the purchaser's physical presence "in, on, or near" the seller's business location.  RCW 82.32.730(1)(a), (b).  Subsection (a) turns on the purchaser *receiving* the service "*at* a business location of the seller."  RCW 82.32.730(1)(a) (emphasis added).  The word "at" is not defined by statute, so we may turn to its ordinary meaning to interpret the provision.  *Portland Vancouver Junction R.R.*, 17 Wn. App. 2d at 295.  "At" is a preposition that is "used as a function word to indicate a presence [or occurrence] *in, on, or near*."  MERRIAM-WEBSTER (emphasis added), https://www.merriam-webster.com/dictionary/at, (last visited Feb. 24, 2026).

---

[2] Even though subsection (a) could result in the sale being sourced to the same single location regardless of a destination or origin-based approach, the plain language of this provision supports that it, too, is destination-focused.  RCW 82.32.130(1)(a).  Subsection (a) turns on the *location where the purchaser receives the service*, meaning that it is a destination-based provision like subsections (b), (c), and (d).  RCW 82.32.730(1)(a)-(d).

Chicago Title argues that the Department places too much emphasis on RCW 82.32.730(1)(a) requiring some physical presence when obtaining a service. To that end, Chicago Title explains that "[t]he buyer's physical presence at the closing office at or around the time of closing has no bearing on the closing itself."[3] Br. of Resp't at 21. Contrary to Chicago Title's position, the word "at" supports that such presence is necessary for the purposes of sourcing the sale. RCW 82.32.730(1)(a). Otherwise, subsection (b) would be meaningless because there would be no distinction between a purchaser receiving a service "*at* the business location of the seller" and "*not*" receiving the service "*at* the business location of the seller." RCW 82.32.730(1)(a), (b) (emphasis added); *Doe v. Wash. State Patrol*, 185 Wn.2d 363, 381-82, 374 P.3d 63 (2016) (explaining that courts "strive to avoid a construction [of a statute] that would render a portion of a statute meaningless"). Moreover, RCW 82.32.730 does not provide an exemption for title insurance, abstract, and escrow services.

In this case, it is undisputed that all services provided by Chicago Title's affiliated agencies occurred outside the state of Washington at remote closing offices. And there is no evidence in the record that a purchaser ever went to the out-of-state offices to meet with Chicago Title's affiliated agencies in person. Instead, all of the services were provided remotely. Chicago Title's application of subsection (a) to these facts is strained in a purchaser-focused analysis. Consequently, RCW 82.32.730(1)(a) is inapplicable.

---

[3] Chicago Title relies on *First American Title Ins. Co. v. Dep't of Revenue*, 144 Wn.2d 300, 27 P.3d 604 (2001), to support that the "'search, examination, and preparation of the report' [is] the 'most significant' part of title insurance for the purpose of B&O and sales tax." Br. of Resp't at 15 (quoting *First Am. Title Ins.*, 144 Wn.2d at 305). But that case did not address the sourcing of such services, so it is not relevant here. *First Am. Title Ins.*, 144 Wn.2d at 301-02, 305.

III.     THE SERVICES PROVIDED BY CHICAGO TITLE ARE PROPERLY SOURCED TO WASHINGTON UNDER RCW 82.32.730(1)(b)

Because subsection (a) does not apply, we turn to the remainder RCW 82.32.730(1) to determine the proper location for the sales to be sourced.  The sales made by Chicago Title's affiliated agencies can be properly sourced under subsection (b) because the service "is not received by the purchaser at a business location of the seller."  RCW 82.32.730(1)(a), (b).  As a result, we must evaluate "where receipt by the purchaser . . . occurs."  RCW 82.32.730(1)(b).

The term "receipt" is defined as "making first use of" a service.  RCW 82.32.730(9)(f).  "Use" is defined by its ordinary meaning.  RCW 82.12.010(6)(b).  As a verb, "use" means "to put into action or service," but it is also defined as "benefit from the use of."  MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/use (last visited Feb. 24, 2026).  And the phrase "make use of" is similarly defined as "to put to use: Employ."  MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/make, (last visited Feb. 24, 2026).

Again, Chicago Title claims that purchasers of title insurance, abstract, and escrow services make "first use" of such services at the "business location of the escrow agent conducting the closing."  Br. of Resp't at 17.  But as the Department correctly points out, "[t]he plain language as well the context of [RCW 82.32.730] prioritizes the *location of the purchaser, not the seller*."  Reply Br. at 7 (emphasis added).

Indeed, every provision under RCW 82.32.730(1) turns on the location of the *purchaser*, not where the seller provides its services.[4]  And under RCW 82.32.730(1), purchasers put such services into action solely *where the property they are seeking to purchase or refinance is located*.

---

[4] The only exception to this is subsection (e).  Still, the provision only permits a sale to be sourced to where the service was provided when none of the previous subsections apply, which all focus on the location of the purchaser.  RCW 82.32.730(1)(a)-(e).

The entire focus of the services Chicago Title provided depends on the property itself. Thus, where the property is located is where the purchaser "makes first use" of Chicago Title's services in providing title insurance, abstract, and escrow, which in this case is Washington, not a remote office.

Therefore, we conclude that the trial court erred in granting summary judgment in Chicago Title's favor because out-of-state, remote sales cannot be sourced under RCW 82.32.730(1)(a), and the sales at issue in this case should have been sourced to Washington under RCW 82.32.730(1)(b).[5]

## CONCLUSION

Accordingly, we reverse the trial court's entry of summary judgment in favor of Chicago Title and remand with instructions to enter summary judgment in the Department's favor.

_____
Veljacic, A.C.J.

We concur:

_____
Lee, J.

_____
Price, J.

---

[5] All contested sales in this case occurred remotely at out-of-state office locations. Because of this, we do not consider the applicability of RCW 82.32.730(1) to the situation where a purchaser goes to Chicago Title's branch office locations in person.